

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
07/27/2012

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 06-36268 |
| VINCENT C. JACKSON, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM OPINION ON: (1) GOINS, UNDERKOFLER, CRAWFORD & LANGDON, LLP AND JOHN J. SHEEDY'S MOTION TO STRIKE DEBTOR'S SUPPLEMENTAL SCHEDULE B; AND (2) DEBTOR'S RECIPROCAL MOTION TO STRIKE
[Doc. Nos. 27 & 37]

### I. INTRODUCTION

In 2011, in *Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011), the Fifth Circuit held that when a debtor fails to disclose a lawsuit on his initial schedules, the doctrine of judicial estoppel may subsequently bar him from benefiting from the undisclosed asset. In April of this year, the Fifth Circuit issued another opinion which estops a debtor from pursuing a lawsuit that he did not disclose on his initial schedules. *Love v. Tyson Foods, Inc.*, 677 F.3d 258 (5th Cir. 2012). In each case, the Fifth Circuit completely barred the debtor from receiving any benefit from the undisclosed asset.

This Court is now confronted with a fact pattern that is similar, but not exactly the same, to the facts in both *Reed* and *Love*. In the case at bar, Vincent C. Jackson (the Debtor) failed to disclose certain assets in his initial Schedules, not the least of which were rights relating to a patent and a cause of action against the lawyers whom he retained to represent him in regards to the patent. Nevertheless, the Debtor argues that his failure to disclose these assets was due to

inadvertence; therefore, according to him, he has the right to supplement his Schedule B and thereafter benefit himself from the newly disclosed assets.

However, certain parties in interest vehemently disagree. The lawyers whom the Debtor sued take the position that just like the debtors in *Reed* and *Love*, the Debtor should receive no benefit whatsoever from this suit. The Chapter 7 trustee's position does not go that far. Rather, the Chapter 7 trustee contends that if the Debtor is to receive any benefit—and the trustee has not yet conceded that the Debtor should receive any benefit—he should only receive such benefit after all creditors in this case (including prepetition creditors and administrative claimants) are paid in full, plus interest.

Thus, the Court is confronted with the following issues: (1) Does the Debtor's failure to disclose the assets constitute inadvertence such that he should be allowed to benefit from the previously undisclosed assets in accordance with normal Chapter 7 principles?; and (2) If his failure was not inadvertent, should the Debtor be completely barred from receiving any surplus after all claims against the estate have been paid in full? For the reasons set forth herein, this Court concludes that: (1) the Debtor's failure to disclose was not inadvertent; and (2) the Debtor is completely barred from receiving any benefit from the Trustee's administration of the assets that were not initially disclosed.

The Court now makes the following Findings of Fact and Conclusions of Law under Federal Rule of Bankruptcy Procedure 9014 and Federal Rule of Civil Procedure 52, which is incorporated into Federal Rule of Bankruptcy Procedure 7052. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves

the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

Finally, to the extent that any of these written Findings of Fact and Conclusions of Law contradict, or are inconsistent with, any oral findings and conclusions made by this Court at the hearing held in this dispute, the former shall govern; and to the extent that these written Findings of Fact and Conclusions of Law do not encompass all of the oral findings and conclusions, the latter shall supplement the written Findings of Fact and Conclusions of Law, unless they contradict them, in which event the written Findings of Fact and Conclusions of Law shall govern.

## II. FINDINGS OF FACT

1. In 1996, the Debtor filed a patent application for the "storage and transfer of games and music over a cellular network to be played out on portable devices." [January 10, 2012 Tr. 19:21 – 20:4].

2. In 2001, the Debtor obtained Patent 6516466 (the Patent) from the United States Patent Office (the Patent Office). [January 10, 2012 Tr. 19:17 – 20:1, 60:22 – 61:3].

3. In late 2003, the Debtor hired the law firm of Goins, Underkofler, Crawford & Langdon, LLP (GUCL) to represent him in legal matters regarding the Patent. [January 10, 2012 Tr. 20:5 – 9]. John J. Sheedy (Sheedy) was the partner at GUCL who was in charge of this representation[1]. [*Id.*]. When the Debtor hired GUCL, Sheedy was representing only the Debtor with respect to the Patent. [January 10, 2012 Tr. 62:21–25].

4. On November 24, 2003, Sheedy received a letter written by Reese H. Davis (Davis), the president of Sovereign Management Group (SMG). [Movants' Ex. No. 1]. SMG is a company

---

[1] Throughout this Opinion, references are made to various exhibits of the Movants. The "Movants" in this case are GUCL and Sheedy, as they have requested this Court to enter an order barring the Debtor from receiving the benefit of any of the assets that he did not initially disclose.

based in Norcross, Georgia which, among other things, is in the business of venture capitalism. Davis' letter set forth a proposal for SMG's role and division of revenue for the market development and licensing program of the Patent. [*Id.*]. Specifically, SMG proposed to provide the following services: (a) secure funding from investors in order to market the Patent; (b) provide revenue potential from industry experts; (c) create a marketing plan for the partners in this venture; (d) pay all expenses associated with the Patent, including those for patent derivatives; (e) pay all legal fees for marketing the Patent, excluding any fees associated with litigation over the Patent; and (f) secure a legal team to protect and, if necessary, litigate over the Patent. [*Id.*]. In exchange for providing these services, SMG proposed that it, plus the investors that it obtained, would receive forty-five percent (45%) of all revenue generated by the Patent, with the Debtor to receive the other fifty-five percent (55%). [*Id.*]. Further, Davis' letter proposed that GUCL serve as lead counsel for contracts and patent direction, and that in addition to receiving a retainer, GUCL would receive a contingent fee not to exceed fifteen percent (15%) of the Patent revenues, with the Debtor and SMG (plus the investors) to pay this fifteen percent (15%) fee. [*Id.*]. Finally, Davis proposed that SMG secure a cellular provider/partner that would be charged a mutually agreed upon amount, after the completion of a market-potential study, to police the industry and ensure that third parties obtained appropriate licenses for the Patent. [*Id.*]. Davis ended this letter by stating: "We are excited about the project and will begin implementation of the marketing program as soon as we reach acceptable terms." [*Id.*].

   5.   On December 1, 2003, Sheedy sent a letter by email to the Debtor. [*Id.*]. Sheedy's letter enclosed the November 24 letter that Davis had written to Sheedy. [*Id.*]. In Sheedy's letter to the Debtor, Sheedy reviewed SMG's proposal and then, in the penultimate paragraph of his letter, stated: "We have spent a great deal of time over the past several months searching for an entity

4

that could partner with you in a joint effort to raise funds and market your patent to the appropriate companies. We think highly of Mr. Davis and his company and have no problem in recommending this proposal to you as a viable means of achieving your goals." [*Id.*]. Finally, in the last paragraph of his letter, Sheedy wrote the following:

> If this proposal meets with your approval, please let me know, and we can prepare the necessary documentation to be signed by the various parties. If you have any questions or concerns about this proposal, please let us know that as well, and we will do everything that we can to answer your questions and meet your concerns. We would encourage you to have both this proposal and any subsequent agreements reviewed by an independent attorney, accountant, or other representative of your choosing.

[*Id.*].

6. The Debtor apparently reviewed and reflected upon Sheedy's December 1 letter to him, plus the SMG proposal, because in December of 2003, the Debtor entered into a Patent Marketing Agreement (PMA) with SMG. [Movants' Ex. No. 2]. The Debtor executed the PMA at a meeting held at a hotel near Hobby Airport in Houston Texas; the Debtor did so after conducting negotiations with Davis and Sheedy at this hotel. [January 10, 2012 Tr. 64:3–17]. Sheedy drafted the PMA and represented both the Debtor and SMG in connection with the PMA. [January 10, 2012 Tr. 28:23–29:3]. In taking on this dual representation, Sheedy did not disclose to the Debtor that Davis and he (i.e. Sheedy) were friends and close confidants. [January 10 Tr. 37:7–15]. The Debtor relied on Sheedy to represent him with respect to the negotiations involving the PMA. [January 10, 2012 Tr. 63:19–23]. Under the PMA, the Debtor and SMG agreed to retain GUCL as lead counsel for contracts and patent prosecution. [Movants' Ex. No. 2]. Additionally, the Debtor would be entitled to 55% of revenue from the Patent; SMG would be entitled to 45% of revenue from the Patent; and GUCL would be paid a contingency fee of 15% of revenue from the Patent, with 10% coming from the Debtor's share and 5% from SMG's share. [Movants' Ex. No. 2].

7.   After execution of the PMA, SMG proceeded to procure investors who put up the cash to help fund the protection and marketing of the Patent. [Debtor's Ex. No. 12]. However, problems arose with procuring approval of the Patent Office, and after deliberation, SMG, GUCL, and the Debtor agreed that they needed to file a re-issue application. [Movants' Ex. No. 3]. By submitting a re-issue application, the parties all risked the possibility that the Patent Office would reject the application and withdraw its earlier approval of the Patent. [*Id.*]. However, if the re-issue application was approved, the Patent would be substantially stronger and significantly more valuable in settlement discussions and litigation with any third parties. [*Id.*].

8.   On July 28, 2004, Sheedy sent the Debtor and Davis a letter, which included a proposed amendment to the PMA. [*Id.*]. Sheedy asserted that the enclosed attachment discussed proposed changes to the Patent that would be included in a re-issue application. [*Id.*]. However, the attachments to Sheedy's letter were a draft of an Assignment of Patent, assigning all rights in the Patent from the Debtor to SMG, and a First Amendment to PMA, stating that the Debtor would assign all of his rights in the Patent to SMG, except for those retained in the PMA. [*Id.*]. Under the proposed amendment, SMG would continue its responsibilities under the PMA and would now "try to improve the value of the Patent through an application for reissue" and that SMG would bear all costs associated with the re-issue application. [*Id.*]. Additionally, the proposed amendment imposed the following duty on the Debtor:

> [The Debtor] agrees to cooperate fully with SMG on any matter related to this Patent; for example, he will sign any document requested by SMG needed to carry out the Agreement such as an application to reissue the Patent, and the attached assignment to be filed with the United States Patent and Trademark Office, and will provide all documents in his possession and other information needed by SMG to meet its obligations under this Agreement.

[*Id.*]. Sheedy asked that both Davis and the Debtor review the proposed Assignment of Patent and First Amendment to PMA, and, if they found the documents acceptable, to send two signed

copies, one for Sheedy and one for the other party, to Sheedy as soon as possible. [*Id.*]. The Debtor did not sign and return the two documents that Sheedy had sent to him.

9.  On August 31, 2004, Sheedy sent a letter by email to the Debtor discussing the "pros" and "cons" of seeking re-issue of the Patent. [Debtor's Ex. No. 1]. In his letter, Sheedy stated that the "pros" of seeking a re-issued Patent would be that it could clear up confusing language in the Patent, which Sheedy felt was hindering the marketability of the Patent. [Id.]. Among the "cons," Sheedy mentioned the possibility that the Patent Office could refuse to re-issue the Patent and that there was a chance the Patent Office would not grant all of the requested changes to the Patent. [Id.]. Sheedy concluded his letter by asserting to the Debtor the following:

> If you [the Debtor] do nothing and refuse to allow a re-issue application to be filed, as of February 2005, the patent will be locked in place. We already know that none of the cellular providers that have been approached have any interest in the patent as worded. A lawsuit could be filed based on the current patent, but in the opinion of every expert we have talked to that lawsuit would most likely be a tremendous waste of time and money and result in a ruling in favor of the alleged infringers.

[*Id.*].

10. On September 8, 2004, the Debtor sent an email to Sheedy. [Movants' Ex. No. 4]. In his email, the Debtor informed Sheedy that he was taken aback by Sheedy's accusations in a prior email (not entered into evidence) that the Debtor was refusing to cooperate and had not provided requested records concerning the Patent. [*Id.*]. The Debtor stated that he was officially rejecting any such accusations. [*Id.*]. The Debtor requested that Sheedy send a letter listing the accusations against the Debtor and that Sheedy refrain from any further accusations as they could be considered "an attack between contract holders" because this was the second threatening statement made by Sheedy towards the Debtor. [*Id.*]. Additionally, the Debtor asked that Sheedy send him three documents: (1) from SMG, an official review of the value of the Patent if all of the proposed changes were accepted and passed all legal boundaries; (2) from Sheedy, an official

7

letter stating the risks and benefits of the reissue; and (3) if SMG's review determined that the Patent was worthless, a letter from GUCL stating that the Patent was worthless. [*Id.*]. Near the conclusion of his letter, the Debtor asserted: "Also, I have the right to fully review and strongly consider any changes to my patent and take the necessary time to review these risks and benefits. I also have the right to hire unbiased outside counsel to help explain the risk and benefits of these changes. Are you denying me these rights?" [*Id.*].

11. On September 9, 2004, Sheedy sent a letter by certified mail and email to the Debtor in response to the Debtor's September 8, 2004 email. [Movants' Ex. No. 5; Debtor's Ex. No. 2]. In his letter, Sheedy indicated that, while he was sorry if the Debtor felt accused or threatened by prior communications, it nevertheless seemed to Sheedy that the Debtor was not cooperating with his partner, SMG. [*Id.*]. Sheedy asked that the Debtor explain why he was delaying the re-issue process to both GUCL and SMG, so that they could better satisfy his needs. [*Id.*]. Furthermore, Sheedy stated that an analysis of the Patent's value would be nothing more than an educated guess unless the re-issue process was started immediately. [*Id.*]. Additionally, Sheedy told the Debtor that no cellular providers or phone manufacturers had expressed interest in paying to license or buy the Patent, and, combined with the unlikely success of litigation over the Patent, that the Patent was probably "worthless" at that particular time, but that the value could be salvaged through the re-issue process. [*Id.*]. In the letter, Sheedy enclosed suggested changes and improvements to the Patent and asked that the Debtor provide his input on the proposals. [*Id.*]. Sheedy reminded the Debtor that GUCL had encouraged the Debtor to seek other counsel to review any information about changes to the Patent and the proposed re-issue and even offered to help the Debtor locate new counsel that he could afford. [*Id.*]. Sheedy concluded his letter by writing:

One very important point you seem to have lost sight of is that SMG is not the enemy. SMG will only succeed if you succeed. It has been determined that no one will succeed unless this patent is re-issued with better wording and stronger claims. If you don't want to allow that to happen, you owe it to SMG to explain it to them in writing so that they can try and meet your needs and expectations. If instead all you do is once again state that you need more time and more information to review, you will continue to give the impression that you are stalling for some unknown reason. Please let us know if there is anything else we can do to help both you and SMG achieve your common goals.

[*Id*.].

12. By mid-September of 2004, the Debtor had come to believe that Sheedy, as his counsel, was biased against him because of the dispute over reissuing the Patent. [January 10, 2012 Tr. 41:13 – 42:18]. The Debtor's testimony on this point was unequivocal and telling. Indeed, when asked at the hearing whether he believed Sheedy took positions favoring SMG and against him, the Debtor responded: "Multiple times." [January 10, 2012 Tr. 41:22–42:1].

13. On November 9, 2004, Kenneth L. Nash (Nash), an attorney retained to help the Debtor evaluate the re-issue process, emailed Sheedy (a) to inform him that the Debtor had agreed that the reissue was in his best interest; and (b) to provide more information for Sheedy in regards to changes to the Patent and additional claims in the reissue application. [Movants' Ex. No. 6].

14. Despite what Nash told Sheedy, the Debtor continued to refuse to cooperate with the reissue application process, not the least of which was his continued refusal to sign the proposed Assignment of Patent and First Amendment to PMA, referenced in Sheedy's letter of July 28, 2004.

15. On January 21, 2005, SMG filed suit against the Debtor in the 334th District Court of Harris County, Texas, seeking an order requiring the Debtor to file a reissue application for the Patent (the State Court Reissue Suit). [Movants' Ex. No. 7].

16. On January 26, 2005, Harris County District Judge Sharon McCally held a hearing on SMG's request for a TRO.  The Debtor could not attend this hearing because he was at work in

Tennessee at this time. [January 10, 2012 TR. 71:15–18]. At this hearing, Sheedy appeared as a witness for SMG and gave testimony adverse to the Debtor. Sheedy never informed the Debtor that he would be testifying against him. After listening to the testimony and hearing argument, Judge McCally denied SMG's requested relief. [Movants' Ex. No. 8]; [January 10, 2012 Tr. 71:8–74:8]. Sheedy never sent the Debtor a copy of the order issued by Judge McCally denying the TRO or verbally inform the Debtor about Judge McCally's ruling. [January 10, 2012 Tr. 72:13–17].

17. Although SMG failed to obtain a court order requiring the Debtor to cooperate with reissuance procedures, further negotiations took place, and on February 2, 2005, the Debtor and SMG signed the Amendment to Patent Marketing Agreement (the Amendment). [Movants' Ex. No. 9]; [January 10, 2012 Tr. 74:23–75:6]. Under the Amendment, the Debtor would assign his rights in the Patent to SMG for the purposes of reissue only; the Patent would revert to the Debtor if SMG had not taken any necessary and feasible action against an infringer of the Patent by February 4, 2007; the Debtor's share of revenue would decrease from 55% to 42.5%; SMG's share of revenue would increase from 45% to 57.5%; if the reissue process failed or the Patent terminated because of the reissue process, SMG would pay the Debtor $150,000.00 in two $75,000.00 installments over two years; and recoveries from litigation would pay expenses and costs, up to five million dollars, and thereafter be paid by SMG and the Debtor in proportion to their shares of the revenue from the Patent. [Movants' Ex. No. 9].

18. On February 2, 2005, the Debtor also signed a document entitled the Assignment of Patent, transferring all of his rights, interests, and title in the Patent to SMG. [Movants' Ex. No. 9]. However, this document was not a separate document, but rather, an attachment to the Amendment. [Id.]. Hence, although the language in the Assignment of Patent appears to be an

absolute assignment of the Patent, the language in the Amendment was limiting: the assignment was "for the purposes of re-issue only," with the Patent to be reassigned to the Debtor if the Patent was not reissued. [Id.]. The Court expressly finds that the Debtor did not then, nor ever has, made an absolute assignment of all of his rights in the Patent to SMG.

19. On February 3, 2005, the Debtor signed another version of the Assignment of Patent, entitled the "Patent Assignment Agreement," which, just like the initial Assignment of Patent, contained language transferring all of his rights, interests, and title in the Patent to SMG. [Debtor's Ex. No. 3]. The reason that the Debtor signed this document was due to the absence of the Patent number in the Assignment of Patent signed on February 2, 2005. Unfortunately, in the Patent Assignment Agreement signed on February 3, 2005, the Debtor's name in paragraph two was misspelled as "Johnson" and not "Jackson." [Id.]. Hence, on February 4, 2005, the Debtor signed yet another document entitled "Patent Assignment Agreement," which contains the exact same language as the document executed on February 3, 2005, with one exception: the Debtor's name (i.e. Jackson) is spelled correctly. [Movants' Ex. No. 10]. The Court expressly finds that the two documents that the Debtor signed on February 3 and February 4, 2005, respectively, were intended to serve as the attachment to the Amendment and are not intended to effectuate an absolute assignment of the Debtor's interest in the Patent to SMG. Stated differently, if the initial Assignment of Patent (which properly spelled the Debtor's name) signed on February 2, 2005 had contained the Patent number, it never would have been necessary for the Debtor to sign the Patent Assignment Agreements of February 3 and 4.

20. On May 15, 2005, the Debtor sent an email at 7:39 p.m. to Sheedy requesting a letter on GUCL's letterhead with Sheedy's signature verifying certain matters. [Debtor's Ex. No. 19]. The exact language which the Debtor used in this email was as follows:

11

As my attorney; I need you to confirm in HARDCOPY WRITING ON Goins, Underkofler, Crawford, & Langdon LETTERHEAD with your signature these statements as verified earlier by you:

1. The inventor (Vincent C. Jackson) decides who purchases or who legal action is taken against as a violator.

2. The inventor (Vincent C. Jackson) has the final sign off of any money deal evolving [sic] a purchase or financial compromise by any customer or violator or purchaser of the patent.

3. The inventor (Vincent C. Jackson) has final decision on the AMOUNT of any purchase or compromise by a purchaser.

[*Id.*].

21. On May 18, 2005, Sheedy sent a letter by email and by first class mail to the Debtor. [Movants' Ex. No. 11]. In this letter, Sheedy told the Debtor that while he would always be the inventor of the Patent, SMG was now the owner. [Id.]. Sheedy suggested that prior communications with the Debtor indicated that he did not view SMG as his partner in regards to the Patent. [Id.]. Sheedy asserted that both the Debtor and SMG would make decisions going forward, based on good faith, of whether or not to pursue litigation in regards to the Patent and whether or not to sell or license the Patent. [Id.]. Sheedy made the following declaration:

If you [the Debtor] try to exercise sole authority over these decisions or feel you have some super veto power, you will not be acting in good faith and will most likely be held in breach of your agreement. The same could be said for SMG. You must work together for your common good.

[*Id.*]. Further, Sheedy hinted that the Debtor should not communicate with the Patent Office in regards to the re-issue application as "the re-issue process is a delicate one" and, because the Debtor was the inventor of the Patent, any direct communication between himself and the Patent Office could result in the loss of the Patent and any rights the Debtor possessed by virtue of his contracts with SMG. [*Id.*]. Sheedy also expressed concern that the Debtor was sending copies of communications between Sheedy and the Debtor to unknown individuals, possibly jeopardizing

confidentiality and the re-issue application. [*Id.*]. Finally, Sheedy again suggested that the Debtor

retain his own counsel in regards to the Patent, and asked that the Debtor inform GUCL and

SMG of any attorneys he retained. [*Id.*].

22. On July 5, 2006, Johnny Ma, an examiner with the Patent Office, filed a final response to

communications, disposing of claims 1–23 in the re-issue application as rejected. [Debtor's Ex.

No. 4].

23. On or about August 28, 2006, the Debtor traveled to the Houston office of the law firm of

Macey & Aleman, L.L.P. (the Macey Firm) in order to retain the firm to represent him in his

intended Chapter 7 case. [Debtor's Ex. No. 16, p.14, time sheet entry reading as follows: "cl

came in, pd $228.00 for filing fee & ddp"].  The lawyer at the Macey Firm who met with the

Debtor and became the attorney-in-charge is named Christopher Lawyer[2] (Mr. Lawyer) [*Id.*],

showing the initials "CWL" (i.e. Christopher W. Lawyer).  Mr. Lawyer accepted the Debtor's

retainer check and had a meeting with him that lasted between fifteen and thirty minutes, which

was the only face-to-face meeting that the Debtor ever had with Mr. Lawyer.  [January 10, 2012

Tr. 83:14–84:12] [March 23, 2012 Tr. 75: 5 – 10].  After the Debtor retained the Macey Firm,

someone employed at the Macey Firm—it is not clear who—provided the Debtor with a form

created by the Firm. The Macey Firm's policy was to give each client this form to complete so

that a legal assistant could use the information which the clients wrote down on the form to work

up a draft of the Schedules and Statement of Financial Affairs (SOFA) for the client's review.

Through this process, the Macey Firm tried to ensure that the original Schedules and SOFA that

were actually filed in the bankruptcy court were complete and accurate.  [March 23, 2012 Tr.

25:1 – 28:5; 41:1 – 3] The form requests that the client set forth whether he has sold, transferred,

or signed over any property, money, or other assets to anyone in the last 2 years. The form also

---

[2] This really is the surname of the attorney-in-charge of the Debtor's Chapter 7 case.

requests that the client set forth whether he owns any patents, and whether he has any claim or right to recover money or property. [Debtor's Ex. No. 17, p. 1, 3]. Further, the form also asks the following question: "Do you own anything else of value that is not listed here?" [*Id.*]. Finally, the Court finds that the Debtor did, in fact, complete this form and returned it by mail to a legal assistant at the Macey Firm in September or October of 2006.  [March 23, 2012 Tr. 76: 10 – 19].

24. On September 7, 2006, the Debtor sent a letter by email to Davis and Sheedy comparing the Patent to a number of other patents. [Movants' Ex. No. 26]. In this email, the Debtor refers to the Patent alternately as "my patent," the "Jackson patent," and "my device." [*Id.*].

25. On September 8, 2006, the Debtor sent a letter by email to Davis and Sheedy discussing the rejection of the Patent's re-issue application. [Movants' Ex. No. 27]. In the email, the Debtor addressed issues he had with the rationale behind the Patent Office's rejection on July 5, 2006 of claims 1-23 in the re-issue application. [*Id.*].

26. On September 19, 2006, the Debtor sent a fax to Sheedy at GUCL. [Movants' Ex. No. 28]. In this fax, the Debtor made notations on various documents from the Patent Office and news articles, referring nine times to the Patent in his notations as "Jackson's Patent" and "my patent." [*Id.*].

27. On October 10, 2006, the Debtor sent a fax to Sheedy at GUCL. [*Id.*]. In this fax, the Debtor made hand-written notations on various documents from the Patent Office and news articles, referring, at least seven times, to the Patent in his notations as "Jackson's Patent" and "my patent." [*Id.*].

28. At some point prior to November 8, 2006, a legal assistant at the Macey Firm, having received the completed form that the Debtor sent in by regular first-class mail, *see* [Finding of Fact No. 23], used this information to type in the information required in the Debtor's Schedules

and Statement of Financial Affairs (SOFA). Then, these documents were provided to the Debtor, together with a Chapter 7 petition which the legal assistant had filled out. The Debtor signed the petition, the Schedules, and the SOFA, and returned these documents to the legal assistant. The legal assistant then delivered these documents to Lawyer, who thereafter reviewed them in preparation for filing them with the Clerk's Office. Mr. Lawyer did not ever have a face-to-face meeting with the Debtor to review the Schedules and the SOFA that would soon be filed with the bankruptcy court once the Debtor's bankruptcy petition was filed.  [See March 23, 2012 Tr. 44:13–19; 64:14–22; 66:10–67:2].

29. On November 8, 2006 (the Petition Date), the Debtor, through the Macey Firm as his counsel, filed his Chapter 7 petition, his Schedules, and his SOFA. [Doc. No. 1].  In his initial Schedule B, the Debtor did not disclose (a) any interest in the Patent; (b) any causes of action against Sheedy, GUCL, or SMG; or (c) his conditional right to receive $150,000.00 pursuant to the Amendment.  [Id.]. Moreover, in his initial Schedule G, the Debtor did not disclose any executory contracts involving Sheedy, GUCL, or SMG. [Id.]. Finally, in his SOFA, the Debtor did not disclose the conditional transfers of the Patent that he made through his execution of the Patent Assignment Agreement and the Assignment of Patent.[3]  [Id.].

---

[3] Schedule B, item 21, requires the disclosure of "[o]ther contingent and unliquidated claims of every nature." In completing this item, the Debtor affirmatively put an "x" under the column "NONE"—which means that he affirmatively represented that he had no causes of action—when he should have scheduled his causes of action against Sheedy, GUCL, and SMG. Additionally, because the Debtor had a conditional interest of $150,000.00 under the Amendment, the Debtor should have disclosed this asset in item 21. Further, Schedule B, item 22, requires the disclosure of any interests that a debtor has in "Patents, copyrights, and other intellectual property," and this item further requires a debtor to "[g]ive particulars." Once again, on his initial Schedule B, the Debtor affirmatively put an "x" under the column "NONE"—which means that he affirmatively represented that he had no interest in any patents—when he should have scheduled his interest in the Patent. Finally, Schedule G requires the disclosure of "all executory contracts of any nature." The Debtor affirmatively checked the box representing that he had no such contracts. Yet, the PMA and the Amendment, which, taken together, comprise one contract that was an executory contract as of the Petition Date, should have been disclosed in Schedule G.

30.  In his initial Schedules, the Debtor disclosed that his total assets were $4,925.00, and his total liabilities were $40,538.00.  [Doc. No. 1, page 6 of 47].  Moreover, the Debtor represented that all of the liabilities were undisputed, unsecured debts.  [Doc. No. 1, p.14 – 19].

31. On the same day that he filed his initial Schedules and SOFA, the Debtor also filed his "Notice to Individual Consumer Debtor Under § 342(b) of the Bankruptcy Code."  [Doc. No. 1, p. 36 – 37].  Both the Debtor and his attorney of record, Mr. Lawyer, signed this document.  By signing this document, Mr. Lawyer certified that "I delivered to the debtor this notice required by § 342(b) of the Bankruptcy Code."  [Id.].  And, by signing this document, the Debtor certified that "I, the debtor, affirm that I have received and read this notice."  [Id.].  The third paragraph of this notice clearly signals to the Debtor the importance of making accurate disclosures in his Chapter 7 case and the risks of failing to do so.  Specifically, this paragraph reads as follows:

> "A person who knowingly and fraudulently conceals assets or makes a false oath or statement under penalty of perjury, either orally or in writing, in connection with a bankruptcy case is subject to a fine, imprisonment, or both.  All information supplied by a debtor in connection with a bankruptcy case is subject to examination by the Attorney General acting through the Office of the United States Trustee, the Office of the Unites States Attorney, and other components and employees of the Department of Justice."  [*Id.*].

32. On or before November 14, 2006, Pamela Johnson (Johnson) was appointed the Chapter 7 trustee for this case. [Doc. No. 7].

33. The meeting of creditors was initially scheduled to be held on December 4, 2006.  [Doc. No. 7.]  However, the meeting was continued until December 18, 2006.  [Id.].

34. On December 18, 2006, Johnson presided over the meeting of creditors.  In attendance were the following individuals:  (1) Lucy Johnson-Davis (Johnson-Davis), a paralegal specialist of the Office of the United States Trustee (UST) [Apr. 19, 2012 Tr. 129:21 – 22]; (2) the Debtor; and (3) James Clark (Clark), an attorney with whom the Macey Firm contracted to appear at this

meeting for the purpose of representing the Debtor.  [Trustee's Ex. No. 1, Bates Stamp No. PGJ 000007].  Clark was not an attorney at the Macey Firm, but rather was—and still is—a solo practitioner whose practice includes extensive representation of debtors at meetings of creditors whereby he is retained by debtors' attorneys to physically appear at the meetings of creditors to represent debtors.[4]  [Apr. 19, 2012 Tr. 109:14 – 110:4].

35. Right before the meeting of creditors began, Clark reviewed with the Debtor a document entitled "341(a) Meeting Questionnaire and Sworn Testimony" (the Questionnaire). [Trustee's Ex. No. 1, Bates Stamp Nos. PGJ 000008-PGJ 000014]. The Questionnaire is a document that all of the Chapter 7 trustees in the Southern District of Texas collectively drafted several years ago

---

[4] It is not atypical in the consumer bankruptcy practice for the attorney of record for a debtor (i.e. the attorney whom the debtor actually retains and who signs the petition and is the attorney-in-charge of the case) to pay a flat fee (typically between $75.00 and $100.00) to another attorney for the latter to appear at the meeting of creditors and represent the debtor during this proceeding.  In bankruptcy parlance, the attorneys who do nothing but appear at meetings of creditors are known as "contract attorneys" or "appearance attorneys." Given Clark's testimony in this case, he appears to be the quintessential "contract attorney," as he apparently does little else but make appearances for numerous attorneys at meetings of creditors.  To quote him exactly: "Well, you know, I started with one firm doing contract appearances, and then other people would call me if they had a conflict, they were in another courtroom, I would just bill them per hearing and attend the 341 [i.e. the meeting of creditors], take the notes, talk to the client, and then send everything to the law office that represents the debtor." [Apr. 19, 2012 Tr. 124:8-13].

The use of "contract attorneys" in the consumer practice is disturbing.  Indeed, some courts have prohibited such use. See, e.g., In re Johnson 411 B.R. 296 (Bankr. E.D. La 2008); In re Harwell, 439 B.R. 455 (Bankr. W.D. Mich. 2010); "Judge, this Is Not My Case" – Ethical Pitfalls Concerning Contract and Appearance Attorneys, 2004 No. 5 Norton Bankr. L. Adviser 3 (May 2004). One explanation given for the use of these attorneys is that the attorney of record must stay back at the office to interview prospective clients, and if he has to stay the time to travel to the courthouse to represent the existing client at the meeting of creditors, then he will lose the opportunity to retain new clients who need to file for bankruptcy.  Stated differently, the justification for use of "contract attorneys" is that the economics of representing consumer bankruptcy debtors requires constantly meeting with prospective clients at the law office in order to generate enough retainers to keep the law firm's doors open and its lights on— even though this means that existing clients are handed off to an attorney standing around at the courthouse whom the debtor will be meeting for the first time (typically without having been told) and who has very little background, if any, of the debtor's file or his particular circumstances.  In short, the use of contract attorneys puts debtors at risk because the "contract attorneys" representing them at meetings of creditors, due to their lack of knowledge about the debtors, cannot represent their interests as well as the attorney of record with whom the debtors presumably spent time meeting prior to the filing of the bankruptcy petition. Perhaps as importantly, aside from being more at risk, debtors wonder just how much the attorney whom they retained really cares about their welfare when they discover, right before being examined under oath by a trustee and creditors, that some attorney whom they have never met is going to represent them.  While the Court recognizes that the practice of law is a business, it is also a profession. Unfortunately, in the consumer bankruptcy practice, some firms have placed business objectives over maintaining professional standards.

Indeed, in the case at bar, it appears that the Debtor never met Clark before the meeting of creditors nor had been told that Clark would be representing him.  [April 19, 2012 Tr. 109:17 – 111:9].

and use at meetings of creditors to reduce the time expended asking debtors fundamental questions about the accuracy of the documents that they have filed.  [Apr. 19, 2012 Tr. 81:7 – 10].  The very first paragraph of this document reads as follows: "The answers and information provided by the Debtor(s) in this document are a part of the Debtor(s) sworn testimony given before the Chapter 7 Trustee or the Trustee's designated representative." The Debtor signed this document, and Clark gave it to Johnson at the meeting of creditors.

36. The Questionnaire contains several statements to which the Debtor must answer either "Yes" or "No."  The Debtor put a check next to the word "Yes" with respect to the following statements:

> "I received and understand the Duties and Responsibilities of a Debtor Under Chapter 7."

> "I received, read, and understand the Statement of Information required by 11 U.S.C. Section 341 prepared by the Office of the United States Trustee."

> "I read, signed and understand the questions and information contained in my Schedules, Statement of Financial Affairs and this written Sworn Testimony."

> "I personally signed my Bankruptcy Petition, Bankruptcy Schedules and Statement of Affairs, and Means Test Analysis prior to my attorney filing them with the Bankruptcy Court."

> "In my Bankruptcy Schedules, I have accurately listed everything that I own including real estate, personal property, and money."  [Trustee's Ex. No. 1, Bates Stamp No. PGJ000010].

37. In the Questionnaire, the Debtor put a check next to the word "No" with respect to the following statements:

> "Did you transfer, sell or convey any real or personal property with a fair market value of more than $2,500 in the last four (4) years?" [Trustee's Ex. No. 1, Bates Stamp Nos. PGJ000011].

> "Do you have any claims or potential claims or lawsuits against anyone whether a lawsuit has been filed or not?" [Trustee's Ex. No. 1, Bates Stamp No. PGJ000013].

38. At the end of the Questionnaire, there are certain paragraphs that are entirely in capital letters—in order to provide emphasis to the Debtor that this language is very important—and these paragraphs read as follows:

"YOU HAVE A LEGAL OBLIGATION TO PROVIDE THE TRUSTEE WITH TRUTHFUL CORRECT AND COMPLETE INFORMATION REGARDING YOUR CASE INCLUDING THE INFORMATION PROVIDED IN THE SCHEDULES, STATEMENT OF FINANCIAL AFFAIRS, THE FOREGOING QUESTIONS AND YOUR TESTIMONY AT THE 341 MEETING.  IF YOU DISCOVER, LEARN OR REALIZE THAT ANY OF THE ANSWERS OR INFORMATION THAT YOU PROVIDED IS INCOMPLETE OR INCORRECT IN ANYWAY YOU MUST NOTIFY THE TRUSTEE IMMEDIATELY IN WRITING.

IF YOU RECEIVE MONEY OR PROPERTY THAT SHOULD HAVE BEEN BUT WAS NOT LISTED IN YOUR SCHEDULES, STATEMENT OF FINANCIAL AFFAIRS OR IN ANSWER TO THE QUESTIONS ABOVE, YOU MUST NOTIFY THE TRUSTEE IMMEDIATELY AND PRESERVE THE MONEY OR PROPERTY UNTIL THE TRUSTEE DIRECTS YOU TO TAKE A SPECIFIC ACTION.  YOU MUST NOT USE OR OTHERWISE DISPOSE OF IT WITHOUT THE TRUSTEE'S PERMISSION." [*Id.*, Bates Stamp Nos. PJ000013 – 14].

39. The very last paragraph of the Questionnaire reads as follows:

"I have read the foregoing and understand the questions.  If represented by an attorney, I have reviewed the foregoing with assistance of counsel.  The answers to the questions are mine.  The answers are based on my personal knowledge and are true and correct." [*Id.*].

40. The Debtor signed this Questionnaire, as did Clark.  [*Id.*].  Clark handed the Questionnaire to Johnson during the meeting of creditors.  [Apr. 19, 2012 Tr. 121:18 – 122:23]

41. At the meeting of creditors, Johnson examined the Debtor under oath.  She asked him whether he had reviewed his Schedules, and he responded in the affirmative.  She also asked him whether his Schedules were true and correct to the best of his knowledge, and he also responded in the affirmative.  She further asked him whether he had accurately listed everything that he owned on his Schedules, and he responded in the affirmative.  [Official Transcript of Dec. 18,

2006 Meeting of Creditors 4:9 – 5:9; Unofficial Transcript of Dec. 18, 2006 Meeting of

Creditors 2:10 – 3:11]. Johnson also gave the Debtor a form entitled "Duties and

Responsibilities of Debtor Under Chapter 7." [April 19, 2012 Tr. 16:3–17]. Johnson gave the

Debtor this form, which is given to all debtors in Chapter 7 at their first meeting of creditors, in

order to emphasize to them that if they subsequently discover or realize that they have not

disclosed assets that they should have initially disclosed, then they have a duty to immediately

disclose to the trustee the existence of these assets. [*Id.*]. Indeed, this form expressly notes that

the Debtor has a continuing obligation in this regard. [Movants' Ex. No. 30].

 42. At the meeting of creditors, Johnson also asked the Debtor the following question: "Is

anybody holding property that belongs to you?" According to the official transcript of the

meeting of creditors, the Debtor responded as follows: "I have no property." [Official Transcript

of Dec. 18, 2006 Meeting of Creditors 4:23 – 25]. However, according to an unofficial transcript

of the meeting of creditors, the Debtor responded as follows: "I have a patent."[5] [Unofficial

Transcript of Dec. 18, 2006 Meeting of Creditors 2:25 – 3:2]. The Court finds that the Debtor

did, in fact, respond by stating that: "I have a patent." Thus, the Court finds that the Debtor,

during the meeting of creditors held on December 18, 2006, did orally disclose that he had an

interest in the Patent. Furthermore, because the Debtor made this disclosure at the meeting of

---

[5] The law firm representing the Debtor at the April 19, 2012 hearing obtained a CD containing a true and correct copy of the MP3 audio file pertaining to the meeting of creditors. Counsel for the Debtor then had a court reporter transcribe what was said at the meeting of creditors. And, according to this transcript, the Debtor responded to Johnson's question by saying "I have a patent." The undersigned judge has repeatedly listened to the audio recording of the meeting of creditors. Initially, the undersigned judge believed he heard the Debtor respond by saying that: "I have no property." However, the more the undersigned judge has listened, the more he is convinced that the Debtor responded by saying that: "I have a patent." The reason that it is difficult to hear exactly what the Debtor said is that just as he was responding, the legal assistant appearing for the UST (Davis) coughed. Unfortunately, her coughing drowns out significantly, but not totally, the Debtor's voice. Nevertheless, now that the undersigned Judge has listened repeatedly to the audio recording of the Debtor's response—as well as for other reasons set forth in this Memorandum Opinion (*see* f.n. 8)—the Court concludes that the Debtor did respond by saying that "I have a patent."

creditors, this Court finds that the Debtor did disclose the existence of the Patent prior to the closing of this Chapter 7 case.

43. Although the Debtor disclosed the Patent to Johnson on the record during the meeting of creditors, she did not follow up with any questions about the Patent while the meeting of creditors was held (and being tape-recorded).   Rather, she asked the Debtor some other questions, and then stopped. [Official Transcript of Dec. 18, 2006 Meeting of Creditors 5:1 – 21].   Johnson then asked Johnson-Davis (legal assistant for the UST) if she had any questions for the Debtor. [*Id.*]. Johnson-Davis did have questions, and proceeded to ask them.   [Official Transcript of Dec. 18, 2006 Meeting of Creditors 5:20 – 12:4; Unofficial Transcript of Dec. 18, 2006 Meeting of Creditors 3:23 – 10:18]. The Debtor responded to Johnson-Davis's questions (none of which are germane to the dispute at bar), and when he finished answering Johnson-Davis's last question, Johnson brought the meeting of creditors to a close without asking the Debtor any further questions. [*Id.*].

44. However, after Johnson concluded the meeting of creditors on the record, she had an off-the-record discussion with the Debtor. [April 19, 2012 Tr. 25: 3 – 21]. According to Johnson's testimony, the Debtor and she discussed the Patent[6]. [*Id.*]. Johnson took some brief notes contemporaneously while having this discussion with the Debtor. [*Id.*]. These notes are set forth in Johnson's handwriting on approximately one third of an 8 inch by 11 inch page of paper. [Trustee Exhibit No. 6, Bates Stamp No. PGJ000032]. On the first line of this page is the word "Patent," and this word is underlined. [*Id.*]. On the next two lines below are the following words: "Old cell phone program – Tandy 1000 SL – EProxy outdated." [*Id.*].   On the next line are the

---

[6] It is not entirely clear whether Clark, in his capacity as the "appearance attorney" representing the Debtor at the meeting of creditors, was present at the off-the-record discussion between the Debtor and Johnson. Clark himself testified that he could not recall. [April 19, 2012 Tr. 119: 6 - 10].

following words: "Never collected any money – no value." On the next line are the following

words: "transferred to SM – 2003 to see if they could collect." Finally, on the last two lines are

the following words: "Not entitled to anything – couldn't collect under the patent." [*Id.*].

45. According to Johnson's testimony at hearings which this Court conducted, these brief

handwritten notes were in her file of the Debtor's case. This file was in storage, but Johnson was

able to retrieve it. [Apr. 17, 2012 p.m. Tr. 6:21 – 22].[7] And, according to Johnson, she took

these notes based upon the off-the-record discussion she had with the Debtor after the meeting of

creditors held on December 18, 2006 had been concluded. [Apr. 17, 2012 p.m. Tr. 11:15 – 18].

She held this off-the-record discussion with the Debtor because after she had concluded the

meeting of creditors, "it dawned on me that I had not gone back and followed up on that [i.e. the

Debtor's response during the meeting of creditors that "I have a patent"] and so I asked him after

the meeting before he left [the courthouse]."[8] [Apr. 17, 2012 p.m. Tr. 13:17 – 20].

46. Johnson's review of her handwritten notes led her to give the following testimony when

asked what she concluded about the Patent after having conducted the off-the-record discussion

with the Debtor: "Well, these notes would have reflected my conversation with him and he

---

[7] On April 17, 2012, the Court held one of several hearings concerning this dispute. The first part of the hearing lasted from 10:26 a.m. to 11:06 a.m.; a recess was taken; and then the second part of the hearing lasted from 4:51 p.m. to 5:25 p.m. Unfortunately, when the hearing for this day was transcribed, two separate transcripts were generated with overlapping page numbers. Therefore, when citing to the testimony given on April 17, 2012, the Court cites to either the "a.m." or the "p.m." transcript.

[8] Johnson also testified that the reason she held the off-the-record discussion with the Debtor about the Patent is that "I mean, because it would—otherwise, I don't know how I would have known to have asked him if he had a patent if it hadn't been on the—if he hadn't responded that way." [Apr. 17, 2012 Tr.13:20-23]. Stated differently, Johnson concluded when she was testifying before the undersigned judge that the Debtor must have responded during the meeting of creditors that "I own a patent" instead of "I own no property" because otherwise, she would never have known to ask him about the Patent in her off-the-record discussion with him after she had concluded the on-the-record meeting of creditors. Johnson's testimony convinces this Court that the Debtor, contrary to the official transcript of the meeting of creditors, and consistent with the unofficial transcript of this event, did actually respond to Johnson's question as to whether anyone was holding property for him by saying that "I own a patent." Indeed, at the April 19, 2012 hearing, Johnson once again testified that she believes the Debtor disclosed the existence of the Patent to her when she held her off-the-record discussion with him after the meeting of creditors had been concluded on December 18, 2006. [April 19, 2012 Tr. 25:9 – 11].

basically told me he had never collected any money. It didn't have any value." [Apr. 17, 2012 p.m. Tr.16:14 – 16]. And, even though the off-the-record discussion that Johnson had with the Debtor took place almost 5 and ½ years ago, Johnson is quite sure, based upon her review of her handwritten notes, that the Debtor represented to her that the Patent had no value. When asked whether the word "outdated" means that the Debtor told her that the Patent was outdated, Johnson responded as follows: "The whole conversation was about the patent. I mean it had to have been about the patent. I wrote patent and I underlined it. I assume that means to me—to me that means the whole thing was outdated." [Apr. 19, 2012 Tr. 27:10 – 13]. Based upon this Court's review of Johnson's notes as well as Johnson's testimony, which is very credible, this Court concludes that in the off-the-record discussion that Johnson had with the Debtor, he affirmatively told her that: (a) he had transferred the Patent to SMG; (b) he had never collected any money from the Patent; (c) the Patent was outdated; and (d) the Patent had no value.

47. Because all of the documents that the Debtor filed with this Court contain no disclosure of the Patent, and because the Debtor affirmatively represented to Johnson in her off-the-record discussion with him that the Patent had no value, and because Johnson believed the Debtor was telling her the truth, Johnson did not request the Debtor to give her a copy of the Patent nor did she conduct an independent investigation about the value of the Patent. [Apr. 19, 2012 Tr. 29:4 – 16]. The Court finds that under these circumstances, Johnson acted reasonably.

48. On January 16, 2007, the Debtor sent a letter by email to Sheedy with his notes on various other patents. [Movants' Ex. No. 29]. In this email, the Debtor refers to the Patent as "my (Jackson) patent" and "the (Jackson) patent." [*Id.*]. Thus, less than one month after the Debtor, in his off-the-record discussion with Johnson, represented to her that he had transferred the

valueless Patent to SMG, he was telegraphing to Sheedy that the Patent really was his, not SMG's.

49. On February 16, 2007, the Debtor obtained a discharge pursuant to an order issued by this Court. [Doc. No. 15]; [Movants' Ex. No. 15].

50. On March 22, 2007, Davis sent a letter by email to Sheedy and the Debtor to inform them that SMG had received a final rejection of the re-issue application from the examiner at the Patent Office, but expressed optimism about the success of a possible appeal. [Movants' Ex. No. 14].

51. On May 30, 2007, James Sheleheda, an examiner with the Patent Office, filed a non-final response to communications, disposing of claims 1–23 of the re-issue application as being rejected. [Debtor's Ex. No. 5].

52. On October 31, 2007, Johnson, in her capacity as Chapter 7 trustee for the Debtor's case, signed and filed a pleading entitled "No-Asset Report: Report of Abandonment." (the No Asset Report) [Doc No. 17]; [Movants' Ex. No. 16]. The No Asset Report represented that this case was a "no-asset" case because "she has neither received any property nor paid any money on account of this estate; that she has made a diligent inquiry into the whereabouts of property belonging to the estate; and that there is no property available for distribution from the estate." [*Id.*]. Further, the No Asset Report set forth that Johnson, in her capacity as Chapter 7 trustee, abandoned all property listed on the Debtor's Schedule B and Schedule C. [*Id.*]. At the time that Johnson filed the No Asset Report, the Debtor had not disclosed in his Schedules the following assets: (a) his interest in the Patent; (b) the $150,000.00 conditional payment; (c) his claims against GUCL, Sheedy and SMG; or (d) his interests in the executory contracts (i.e. the Agreement and the Amendment). Therefore, when Johnson filed the No Asset Report, she had

no idea that the Chapter 7 estate, for which she was responsible, both owned these assets and that these assets had value. [April 19, 2012 Tr. 32: 5 – 33:6]. The only asset about which she was aware was the Patent, as the Debtor had orally informed her at the meeting of creditors that he owned the Patent; however, the Debtor also had informed her (right after the meeting of creditors) that the Patent had no value and that he had transferred it to SMG. Thus, when she filed the No-Asset Report, this Court finds that Johnson honestly and truly believed that the Debtor's estate had no assets to administer. [April 19, 2012 Tr. 21: 21 – 25:2; 55:21 - 56:2] [April 17, 2012 p.m. 14: 25 – 15: 6].

53. On November 21, 2007, the Court, in reliance on the No Asset Report, closed the Debtor's Chapter 7 case. [Doc. No. 18 and Movants' Ex. No. 24].

54. On January 3, 2008, at 8:39 P.M., the Debtor sent an email to Sheedy which read as follows:

> Hello Mr. Sheedy,
>
> If it was easy and obvious I would not be asking your help and you do this everyday because it is your profession. As my attorney I am asking for your assistance in being able to see changes and responses using the www.uspto.gov website. Please give me step by step procedure in doing this please. Are you denying my request??
>
> Sincerely,
> Vincent.

[Debtor's Ex. No. 21].

55. On January 4, 2008, at 10:49 A.M., Sheedy responded to the Debtor's email of January 3, 2008 by stating:

> Vincent, 1, Go to www.uspto.gov . 2, Click on "Patents" . 3, Click on "View in PAIR" . 4, Click on "Public PAIR" . 5, Entr App.#11/052,015 . 6, Click on "Image File Wrapper" . 7 Click on any listed document and read it. If you still can't get what you need then please call me.

[Debtor's Ex. No. 21].

56. On or about March 8, 2011, the application for reissuance of the Patent was granted. [Movants' Ex. No. 18].

57. On May 5, 2011, Charity Platt (Platt), Sheedy's assistant at GUCL, sent a letter by email to Davis and the Debtor. [Debtor's Ex. No. 7]. Attached to the email was a proposed Second Amendment to the PMA (the Second Amendment). [Debtor's Ex. No. 8]. The Second Amendment contained the following agreements: (a) SMG would pay all necessary filing and registration fees to have the Patent reissued; (b) SMG, in its discretion, would continue to spend the necessary funds and time to market the reissued patent and bring any necessary legal action against any potential infringers of the reissued patent; and (c) the Debtor would agree to extend the assignment of the Patent to SMG through its expiration date and would ratify the division of Patent revenue from the Amendment. [*Id.*]. In her letter, Platt expressed that it was unnecessary for the Debtor to have a meeting with SMG or GUCL in order to sign the Second Amendment; rather GUCL just needed each party to sign the document and send it back to GUCL's office. [Debtor's Ex. No. 7]. Finally, Platt asked that the Debtor send his bankruptcy filing documents to GUCL so they could determine what effect, if any, the Debtor's bankruptcy case had on the Patent. [*Id.*].

58. On May 13, 2011, Sheedy sent the Debtor a letter by email asking again that the Debtor sign the Second Amendment and return it to GUCL as quickly as possible. [Debtor's Ex. No. 9].

59. On May 16, 2011, at 10:38 a.m., the Debtor sent a letter by email to Sheedy and Davis stating that he required Davis to come to Houston to sign the Second Amendment in person. [Movants' Ex. No. 17]. In this letter, the Debtor asserted that the Patent was worth hundreds of millions of dollars and possibly billions of dollars over a ten year license period.[9] [*Id.*]. The

---

[9] During the hearing, the Debtor also testified that the Patent is worth "around three-quarters of a billion dollars." [March 23, 2012 Tr. 90: 11-14].

Debtor asserted that he did not have an obligation to turn over his bankruptcy filings to GUCL and SMG because he was not the legal owner of the Patent when he filed. [*Id.*]. The Debtor, however, agreed to send such documentation, provided that GUCL and SMG would not use the documents against the Debtor in court and would not give the documents to third parties. [*Id.*]. The Debtor stated his reasoning behind these conditions as follows: "The reason for this is I question the true motives since you knew I did not own the Patent during the reissue process." [*Id.*]. The Debtor, in exchange for signing the Second Amendment, made the following demands: (a) if SMG failed to make efforts to enforce the Patent against infringers and obtain a profit from such legal action by May of 2014, then the Patent would revert back to the Debtor, SMG would reassign the Patent to the Debtor, and the Debtor could cancel the contract with SMG without any penalty; (b) the division of revenue would revert back to the percentages laid out in the PMA, with the Debtor receiving fifty-five percent (55%) and SMG receiving forty-five percent (45%); (c) the Debtor would have the right to approve any sale or license of the Patent proposed by SMG, including the right to stop any such sale or license if the Debtor was unsatisfied with the amount being paid; and (d) the Debtor, along with his counsel if he so wished, would have to be present at any and all sale and licensing signings and that his approval and signature would be required for such agreements to be valid. [*Id.*].

60. On May 16, 2011, at 2:53 p.m., Davis sent the Debtor a letter by email in response to the Debtor's email earlier that same day. [Debtor's Ex. No. 10]. In his letter, Davis essentially rejected all of the Debtor's proposed changes to the Second Amendment and reminded the Debtor of the time and money SMG had already expended during the re-issue process to make the Patent marketable. [*Id.*].

61. On May 16, 2011, Sheedy sent the Debtor a letter to follow up on the correspondence earlier in the day, as well as a conference call that day between Sheedy, Davis, and the Debtor. [Debtor's Ex. No. 11]. In this letter, Sheedy asserted that SMG required that the Debtor sign the Second Amendment to feel comfortable spending more time and money to monetize the Patent. [*Id.*]. Sheedy informed the Debtor that refusing to sign the Second Amendment would likely result in the loss of the Patent through abandonment, making the Patent available for public use without anyone needing to pay for such use. [*Id.*]. Additionally, Sheedy told the Debtor that investors might sue the Debtor for damages if they learned of his actions. [*Id.*]. Sheedy requested that the Debtor sign and return the letter to indicate that he understood the consequences of not signing the Second Amendment. [*Id.*].

62. On May 23, 2011, Davis sent the Debtor a letter by email informing the Debtor that the Patent Office would consider the Patent abandoned as neither the Patent filing nor fee payment had been executed. [Debtor's Ex. No. 12]. Davis informed the Debtor that he had violated the original contract (i.e. the PMA), that SMG could not move forward with marketing the Patent, and that SMG had no intention to renegotiate the terms of the PMA or the Second Amendment. [*Id.*]. Further, Davis told the Debtor that the investors were not pleased, and hinted that they would not just walk away, but instead would pursue legal action against the Debtor, which could become ugly and a large problem for the Debtor. [*Id.*]. Davis suggested that the Debtor speak with Sheedy because he "may still feel he has some sense of obligation to [the Debtor], only if it is a personal one to keep [the Debtor] out of further trouble." [*Id.*]. Davis blamed the impasse between SMG and the Debtor on the Debtor's conduct and concluded his letter with: "This current condition brings me [Davis] much personal disappointment there has been a loss of millions of dollars and years which now will be considered a total waste. My only thought at this

point is shame on you [i.e. the Debtor], a fairy tale ruined solely because of your selfishness."
[*Id.*].

63. On May 31, 2011, the Debtor, through the law firm of Reaud, Morgan & Quinn, L.L.P.
(the Reaud law firm), paid the $1,510.00 fee by cashier's check for the reissuance of the Patent.
[Debtor's Ex. Nos. 13 & 14].

64. On June 1, 2011, Sheedy sent the Debtor a letter by email responding to a question of the
ramifications of a material breach of contract. [Debtor's Ex. No. 6]. Additionally, Sheedy
reminded the Debtor that SMG, at that moment, owned the Patent by virtue of the assignment.
[*Id.*].

65. On June 7, 2011, the Debtor filed suit against Sheedy, GUCL, and SMG in the District
Court of Harris County, Texas (the State Court), alleging breach of contract, breach of fiduciary
duty, breach of partnership duty, and malpractice (the State Court Claims). [Movants' Ex. No.
18]. Many of the events that form the basis of the State Court Claims occurred before the Debtor
filed his Chapter 7 petition. At the time that the Debtor brought the State Court Claims in the
State Court, the Debtor did **not** seek to reopen his Chapter 7 case in order to disclose these
claims to this Court. [Movants' Ex. No. 21]. Nor did the Debtor ever inform Johnson (the initial
Trustee), in writing or verbally, about the filing of the suit in State Court in 2011 in which he is
prosecuting the State Court Claims. [April 19, 2012 19: 3 – 6; 107: 3 – 108: 4].

66. On July 12, 2011, the Patent was re-issued by the Patent Office. [Movants' Ex. No. 19].

67. On August 18, 2011, GUCL and Sheedy, in the State Court, filed their original answer to
the Debtor's original petition, alleging, *inter alia*, that the Debtor lacked standing to sue and that
the State Court Claims were barred by judicial estoppel and limitations. [Doc. No. 27].

68. On August 31, 2011, GUCL and Sheedy, in the State Court, filed a Motion to Dismiss for Lack of Standing and Subject Matter Jurisdiction. [Movants' Ex. No. 20].

69. On October 4, 2011, the Debtor filed an Expedited Motion to Reopen Chapter 7 Bankruptcy Case and Appoint Trustee. [Doc. No. 21]; [Movants' Ex. No. 21].

70. On October 4, 2011, the Debtor also filed a Supplemental Schedule B disclosing the following assets: the State Court Claims, the Patent, and the future profits interest pursuant to the PMA and the Amendment. [Movants' Ex. No. 22]. However, the Debtor still did not schedule the conditional right to $150,000.00 pursuant to the Amendment. Nor did the Debtor amend his Schedule G to disclose the PMA and the Amendment as an executory contract.

71. On October 5, 2011, this Court granted the Debtor's Motion to Reopen his Chapter 7 case. [Doc. No. 23].

72. On October 5, 2011, Ben B. Floyd was appointed the trustee (the Trustee) for this reopened case.[10] [Doc. No. 23].

73. On November 1, 2011, GUCL and Sheedy filed their Motion to Strike Debtor's Supplemental Schedule B (the GUCL/Sheedy Motion). [Doc. No. 27]. The GUCL/Sheedy Motion requests the following relief: (a) that the Debtor not be allowed to amend his Schedule B to disclose the previously undisclosed assets; (b) that the Debtor be estopped from asserting any claim against GUCL and Sheedy due to the Debtor's failure to initially schedule any such claims in this case; (c) that this Court issue an order that the Debtor has no interest in any such claims; and (d) that any interest in the State Court Claims that the Trustee may have are barred by the

---

[10] Normally, the initially appointed trustee, Pamela Johnson, would have remained as trustee once the case was reopened. However, at the time that this case was reopened, Ms. Johnson was no longer on the Chapter 7 Trustee Panel for the Southern District of Texas. Accordingly, Mr. Floyd, who was on the Panel at the time this Court granted the Motion to Reopen, became the Trustee.

applicable statute of limitations or, alternatively, are "significantly limited" by *Reed*. [Doc. No. 27].

74. On November 25, 2011, the Debtor filed his response to the GUCL/Sheedy Motion, which strongly opposes the relief sought therein. [Doc. No. 30]. In his response, the Debtor admits, among other things, the allegations in Paragraph 1 that GUCL and Sheedy are creditors and/or parties-in-interest. [*Id.*].

75. On January 9, 2012, the Debtor filed his Motion to Strike the GUCL/Sheedy Motion on the grounds that GUCL and Sheedy lack standing to seek relief because they are neither creditors of the Debtor nor parties-in-interest in this case (the Debtor's Motion). [Doc. No. 37].

76. On January 30, 2012, GUCL and Sheedy filed their response to the Debtor's Motion. [Doc. No. 51].

77. On January 10, January 18, March 23, April 17, and April 19, 2012, this Court held a simultaneous hearing on the GUCL/Sheedy Motion and the Debtor's Motion. [Doc. Nos. 40, 47 & 55].

78. On March 23, 2012, in open court on the record, GUCL and Sheedy orally amended the GUCL/Sheedy Motion, revoking all the relief requested in the Motion with one exception. Now, GUCL and Sheedy are requesting that this Court hold that the Debtor is judicially estopped from prosecuting the State Court Claims and that he is further judicially estopped from receiving any proceeds from the Trustee's administration of the State Court Claims. [March 23, 2012 Tr. 103:4 – 104:15]. The Trustee, in his closing argument at the hearing on the GUCL/Sheedy Motion and the Debtor's Motion, argued that the Debtor should not only be estopped from recovering any

proceeds from his (*i.e.* the Trustee's) prosecution of the State Court Claims[11], but should also be estopped from receiving any benefit from the Trustee's administration of the Patent, the PMA, and the Amendment. [March 23, 2012 Tr. 122:7 – 123:3]. The Trustee did, however, leave open the possibility that he might not oppose the Debtor eventually receiving some benefit from these assets if, but only if, all creditors of the estate are paid in full from proceeds generated from the liquidation of these assets.

79. On March 23, 2012, at the hearing on the GUCL/Sheedy Motion, the Debtor testified that he did not list the Patent in his original Schedules because he did not have ownership of the Patent and he did not believe it had any value. [March 23, 2012 Tr. 78: 2 – 6]. Additionally, the Debtor testified that his bankruptcy attorney failed to properly counsel him on the importance of complete and accurate disclosure in his Schedules and SOFA. [March 23, 2012 Tr. 75:5 – 77:15].

80. On April 17, 2012 and April 19, 2012, Johnson, the initial Chapter 7 trustee in this case, testified about the testimony that the Debtor gave at the meeting of creditors and the off-the-record discussion that she had with the Debtor immediately following the conclusion of the meeting of creditors. Using her handwritten notes that she took during her off-the-record discussion with the Debtor, Johnson testified that the Debtor affirmatively told her that the Patent had no value.

---

[11] By supporting GUCL and Sheedy on this one point, however, the Trustee is not waiving any opposition that he might have in the future to any argument made by GUCL and Sheedy that the State Court Claims are barred by limitations or in some way barred by the holdings in *Reed* and *Love*.

### III. CREDIBILITY OF WITNESSES

The following witnesses testified at the hearing on the GUCL/Sheedy Motion and the Debtor's Motion:

(1) Vincent Jackson (the Debtor)—The Court finds the Debtor's testimony to be less than credible on material points.  For example, he testified that he did not schedule the Patent because he believed he owned no interest in the Patent when he filed his Chapter 7 petition and, therefore, did not want to commit perjury by representing that he did have an interest in this asset.  [Jan. 10, 2012 Tr. 21:4 – 22:2]; [March 23, 2012 Tr. 77:22 – 78:12].  Yet, less than sixty days prior to the Petition Date, the Debtor, in one document sent to Sheedy, referred to this asset as "my patent" or "Jackson's patent" *no less than nine times*. [Finding of Fact No. 26].  In a second document sent to Sheedy less than thirty days prior to the Petition Date, the Debtor referred to this asset as "my patent" or "Jackson's patent" *no less than seven times.* [Finding of Fact No. 27].  Indeed, if anything, the Debtor was obsessed with the Patent; and if he was not spending every waking hour attempting to protect his rights in the Patent so as to ensure his own future financial status, he was losing sleep over how to preserve his interest in this asset.  The Debtor's testimony that he did not schedule the Patent due to his belief that he had no interest in this asset is simply not credible.  His explanation that he did not want to commit perjury seems to have been a designed trial strategy to convince this Court that his failure to disclose was an effort not to undermine the bankruptcy process, but to promote its integrity.  This tactic will not work.

Moreover, even if the Court were to believe this particular testimony, the Debtor cannot explain why he failed to disclose the $150,000.00 conditional payment that SMG was obligated to pay him in the event the reissue process failed under the Amendment.  [*See* Finding of Fact No. 17].  Under the Amendment, the Debtor was to receive, under certain circumstances, two

33

$75,000.00 payments for a total of $150,000.00. The Debtor has yet to give this Court any good reason why he failed to disclose this asset. It may be a contingent right to payment, but it is nevertheless an asset that the Debtor needed to disclose. *In re Coastal Inc.*, 179 F.3d 197, 208 (5th Cir. Tex. 1999) (The Bankruptcy Code subjects debtors to disclose "any claim with potential . . . even if it is *contingent*, dependent, or conditional") (emphasis added).

Nor has the Debtor given this Court any plausible reason why he did not disclose that he had causes of action against GUCL, Sheedy, and SMG. By his own testimony, the Debtor conceded that he believed Sheedy was working against his (i.e. the Debtor's) interest almost two years prior to the Petition Date. [Finding of Fact No. 12]. Moreover, twenty-two (22) months prior to the Petition Date, the Harris County District Court alerted the Debtor to potential causes of action against GUCL, Sheedy, and SMG through the issuance of an order on January 26, 2005 denying SMG's request for an appointment of a receiver or alternatively, an injunction. [Finding of Fact No. 16]. Specifically, the Harris County District Court stated in its order that Sheedy had a conflict of interest testifying against the Debtor. [Movants' Ex. No. 8, p. 3]. It is clear that by the Petition Date, the Debtor believed that GUCL in general, and Sheedy in particular, had not properly represented him and that, as a result, there was a specific and concrete risk of harm to his interests in the Patent. Stated differently, by the Petition Date, any claims against GUCL, Sheedy and SMG had accrued. *In re Swift*, 129 F.3d 792, 795-96 (5th Cir. 1997) ("The accrual of a cause of action means the right to institute and maintain a suit . . . some form of legal injury must occur before these causes of action accrue. But, it is not necessary to know immediately the type and extent of that injury. All that is needed is a specific and concrete risk of harm to the party's interest."). Yet, at the hearing, the Debtor could give no reasonable explanation why he failed to schedule these causes of action in his initial Schedule B.

There is more.  At the hearing in this Court, the Debtor's general bankruptcy counsel, Christopher Lawyer, testified that at the time he was representing the Debtor, it was his law firm's policy to provide its debtor/clients with a certain internal form to complete.  [Finding of Fact No. 23].  According to Mr. Lawyer, the firm's policy was to have each of its clients answer all of the questions on this form so that the Schedules and SOFA to be filed would be complete and accurate.  [Finding of Fact No. 23].  One of the questions on this form inquires whether the client owns any interest in "Patents, copyrights and other intellectual property." [Ex. No. 17] Another of these questions reads as follows: "Lawsuits pending? Do you or does anyone in your family have an injury or other claim or right to recover money or property?"  [*Id.*].  Then, the form inquires as to what kind of claim.  [*Id.*].  Although the law firm where Mr. Lawyer was practicing law at the time he represented the Debtor no longer has the file of the Debtor's case— thereby precluding introduction of evidence of the actual form completed by the Debtor—a pristine copy of the form was introduced into evidence, and Mr. Lawyer testified that the Debtor would have been asked to complete this form.  [March 23, 2012 Tr. 39:10 – 18].  Indeed, the Debtor himself testified that he probably filled out this form. [March 23, 2012 Tr. 75:19 – 76:22].  The questions noted above on this form underscore that prior to filing his initial Schedules and SOFA, the Debtor was required to answer questions that were written in layman's terms and easily understandable. It strains credulity to believe that the Debtor did not know that he had to disclose any interests he had in the Patent on his initial Schedule B. It further strains credulity to believe that the Debtor did not know that he had to disclose any cause of action that he had against GUCL, Sheedy, and SMG.

But there is more.  The form also asks the following question:  "Have you sold, transferred or signed over any property, money, or other assets to anyone in the last 2 years?"

[Ex. No. 17].  This question is on the form because Question Number 10 on the Statement of Financial Affairs reads as follows: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case." [*Id.*].  If, in fact, the Debtor really believed that he had assigned all of his interests in the Patent—and that is what he testified to at the hearing [March 23, 2012 Tr. 77:22 – 78:3] —then he should have disclosed this assignment in his initial SOFA.  Yet, he failed to do so.

All in all, there are numerous contradictions in the Debtor's testimony on certain key issues, including the ones discussed immediately above. His testimony on these issues is not credible, and the Court therefore gives little weight to his testimony. On other issues, however, his testimony is more credible. For example, his testimony about the lack of time that Mr. Lawyer and Clark spent counseling him is very credible; and his testimony about his relationship with Sheedy is also credible. On these issues, as well as other more straightforward issues – such as his employment background and education – the Court gives greater weight to his testimony.

(2) Christopher Lawyer (Mr. Lawyer)—Mr. Lawyer testified that he presently practices law in Boerne, Texas as a title attorney.  [March 23, 2012 Tr. 20:25 – 21:4].  He also testified that between August 2005 and December of 2006, he practiced law at the Macey Firm, and that he was the attorney-in-charge of the Debtor's Chapter 7 case.  [March 23, 2012 Tr. 20:8 – 21: 4].  He further testified that he does not have the Debtor's file that was kept at the Macey Firm evidencing the representation of the Debtor.  [March 23, 2012 Tr. 39:10 – 18].  Finally, he testified about the Macey Firm's policies and procedures for the completion and filing of any client's schedules and SOFA. [March 23, 2012 Tr. 39:4 – 43:7].  This testimony included a review of the Macey Firm's form which the Firm, in the regular course of its legal practice, gave

36

to its clients to complete so that a legal assistant could then work up drafts of the Schedules and SOFA for the client's review and signature. [*Id.*].

Although the Court is disturbed by the lack of time Mr. Lawyer spent giving legal counsel to the Debtor during the time that Mr. Lawyer was representing him, the Court finds Mr. Lawyer to be a credible witness and gives much weight to his testimony.

(3) Nosa Aduwa (Mr. Aduwa)— Mr. Aduwa is presently the managing attorney of the Houston office of the Macey Firm. His testimony was very brief. He testified that he checked with the home office of the Macey Firm, which is located in Chicago, and that the Debtor's file has not been located. [March 23, 2012 Tr. 59:11 – 60:1]. Mr. Aduwa also testified that the Debtor's file is not at the Houston office. [*Id.*].

The Court finds Mr. Aduwa to be a credible witness and gives much weight to his testimony.

(4) John J. Sheedy – Sheedy's conduct since he began representation of the Debtor casts a pall on his credibility. The Debtor hired Sheedy to assist him in marketing the Patent and believed that Sheedy represented *only* him on matters concerning the Patent. [January 10, 2012 Tr. 62: 21 – 25] [Finding of Fact No. 3]. Then, Sheedy received a written proposal from Davis, SMG's president, regarding the marketing of the Patent. [Finding of Fact No. 4]. Sheedy then sent this proposal to the Debtor recommending that the Debtor accept it. [Finding of Fact No. 5]. Sheedy then participated in the negotiations between the Debtor and SMG that led the Debtor's acceptance of the proposal. [Finding of Fact No. 6]. During these negotiations, Sheedy, by this time, was representing both the Debtor and SMG, and he had failed to inform the Debtor that he and Davis were friends and close confidants. [*Id.*]. Thus, Sheedy was neither fulfilling his duties to the Debtor nor being candid with him. Meanwhile, the very proposal that Sheedy convinced

the Debtor to accept included having Sheedy and his firm, GUCL, serve as "lead counsel for contracts and patent direction." [*Id.*].

As if this was not already enough of a conflict of interest, Sheedy proceeded to draft the PMA, thereby securing a significant financial interest and further clouding his loyalty to his client, the Debtor.  Under the executed PMA, Sheedy in fact secured the maximum 15 percent of the revenue proposed by SMG—with the Debtor paying two-thirds of that fifteen percent and SMG paying only one-third of that fifteen percent.  [*Id.*].

Eventually, the Debtor and SMG started having disputes over the reissuance of the Patent. When Sheedy urged the Debtor to cooperate in seeking the reissuance of the Patent, the Debtor requested that Sheedy "relieve [himself] as counsel." [Movants' Ex. No. 8, p. 2].  Sheedy declined to do so.  The Debtor thereafter continued to believe that Sheedy was his attorney. [January 10, 2012 Tr. 64:22 – 65:4].   Indeed, the Debtor stated that as far as he knew, "[Sheedy's] still my lawyer." [January 10, 2012 Tr. 72: 8 – 17].

Sheedy, however, claims that the Debtor fired Sheedy in an email on October 20, 2004. [January 10, 2012 Tr. 102: 2 – 4].  Yet, Sheedy failed to present any documentation to support that statement. [January 10, 2012 Tr. 112: 12 – 21].   Meanwhile, the Debtor sent emails to Sheedy that began, "Hello Mr. Sheedy, as my attorney. . . ." [*See* Debtor's Ex. No. 19, p.2]. Sheedy never corrected the Debtor.  He could have—and should have—done so, if he really believed that he no longer represented the Debtor. Sheedy did not do so.

Upon termination of representation, attorneys must take reasonable steps to protect their client's interest, including "giving reasonable notice [of termination] to the client." Tex. Disciplinary Rules Prof'l Conduct R. 1.15(d). When there is doubt as to whether an attorney-client relationship has been terminated, the attorney should clarify the relationship, "*preferably*

*in writing*, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the attorney has failed to do so." *See In re Cypresswood Land Partners*, 410 B.R. 247, 255 (Bankr. S.D. Tex. 2009) (emphasis added) (quoting Tex. Disciplinary R. Prof'l Conduct 1.02). Clearly, Sheedy failed to properly communicate in clarifying his relationship with his client, the Debtor.

When SMG filed suit against the Debtor in the State Court Reissue Suit, Sheedy testified in District Judge Sharon McCally's court as an expert witness for SMG to try to convince the Court to issue a TRO against the Debtor. Sheedy testified that the PMA required the Debtor to cooperate in reissuing the Patent. [Movants' Ex. No. 8, p. 2]. In other words, Sheedy testified against the Debtor, his own client. Sheedy contends that he voluntarily came to court as a witness for SMG to "state the facts"—*not* to testify against the Debtor. [January 10, 2012 Tr. 113:8 – 15]. This explanation is at best disingenuous.

According to the Debtor's testimony, Sheedy never told the Debtor that he testified against him at the injunction hearing. [January 10, 2012 Tr. 72: 18 – 25]. In fact, Sheedy never told the Debtor about Judge McCally's decision and never sent the Debtor a copy of the court's order. [January 10, 2012 Tr. 73:19 - 74:8]. He doubtless did not do so because of what Judge McCally stated in her order about Sheedy:

> "The court rejects the legal conclusions and contractual interpretations offered by John Jack Sheedy because (a) it is not appropriate expert testimony; and (b) Mr. Sheedy, as drafter of the agreement [i.e. the PMA] and one who retains the contingency fee interest in the subject matter, appears to have a conflict of interest on the face of the agreement which could reasonably interfere with his interpretation of the agreement."

[Movants' Ex. No. 8, p. 3]. Judge McCally's order further indicated that the Debtor had communicated with Sheedy as a "shared" attorney. [Movants' Ex. No. 8, p. 2].

In sum, Sheedy's conflict of interest, his past testimony against the Debtor, and his continuing financial interest in the Patent makes his testimony biased and not entirely credible. The Court gives little weight to his testimony.

(5) Pamela Johnson (Johnson)—Johnson gave testimony about the meeting of creditors over which she, as the initial Chapter 7 trustee in this case, presided on December 18, 2006. She also testified about the off-the-record discussion that she had with the Debtor immediately following the conclusion of the meeting of creditors. Finally, she gave testimony about the handwritten notes that she took during her off-the-record discussion with the Debtor.

The Court finds Johnson to be a very credible witness and gives substantial weight to her testimony.

(6) James Clark (Clark)—Clark served as the "appearance attorney" for the Debtor at the meeting of creditors held on December 18, 2006. While the Court finds unsettling his testimony about the assembly line approach he takes in appearing for debtors who are not his clients at their meetings of creditors—including his representation of the Debtor at his meeting of creditors— the Court nevertheless finds Clark to be a credible witness. He certainly testified candidly about his representation of the Debtor. Accordingly, the Court gives much weight to his testimony.

(7) Lucy Johnson-Davis (Johnson-Davis)—Johnson-Davis, in her capacity as a paralegal specialist for the U.S.T., was present at the meeting of creditors held on December 18, 2006. However, Johnson-Davis testified that she is unable recall the events of the meeting of creditors. No further testimony was adduced from Johnson-Davis. [4/19/2012 Hearing at 2:43:00 – 2:46:00]. The Court finds Johnson-Davis to be a very credible witness, although her testimony was not helpful given her inability to recall any of the details about the meeting of creditors.